To affirm this case on the reasoning of the majority opinion, while reaching perhaps an immediately favorable result, would set an undesirable precedent in the already tenuous area of testamentary construction.
A brief review of the pertinent facts shows that in 1928 the testator, George S. Houston, executed a will which in essence left a life estate followed by a series of future interests contingent upon survival of the life tenant in his Belle Mina, Alabama farm. The clause in question provided that:
 Should both of my said nephews die before the said [life tenant], leaving lawful issue, then said issue shall take, share and share alike. . . . (emphasis added)
In 1931 the Legislature passed 1931 Alabama Acts, p. 504-8, which was intended to give an adopted child the rights ofinheritance from his adopting parents as if born to them in lawful wedlock. In 1934 George S. Houston died and was survived by one half-sister and one full sister and his two nephews. His wife's niece, Ellen Irvine Tolley, went into possession of the estate as life tenant and remained such until her death. In 1947 one of the nephews, Charles E. Drennen, adopted the appellee, James L. Drennen. Charles died in 1960, and his brother, Houston, died in 1961, neither leaving any other natural or adopted children. In 1976 the appellee brought an action to quiet title to the land in question. In that action the trial court construed the terms "lawful issue" to include the appellee. Appellants Packer and Thompson, nieces of the testator on his wife's side, appealed the trial court's decision. In essence this Court is called upon to decide whether or not in his will the testator intended a subsequently adopted child to be included within the terms "lawful issue."
The majority is correct in their finding that "lawful issue" included adopted children in this instance. However, the majority holding that the testator's testamentary intent in 1928 was to that effect because in 1931 the Legislature said something vaguely connected to this area of law is tenuous. It is not necessary to hold that a statute passed subsequent to the execution of a will is instructive as to the public policy prevailing previously at the time the will was executed and when the testator's intentions were formed. The will in this case was executed three years before the enactment of the statute cited by the majority.
I do not believe that the statute cited can throw light on the "policy" prevailing at that time anyway. The pertinent portion of the statute recites:
 [A]nd the child shall be invested with . . . the rights of inheritance to real estate, or to the distribution of personal estate on the death of such adopting parent or parents as if born to them in lawful wedlock. . . . (1931 Ala. Acts. No. 405, p. 504)
Aside from having nothing to do with testate succession, this statute on its face would not apply to the fact situation at hand even if the testator had died intestate. The appellee was not the adopted child of the testator. "Adopted children do not inherit from collaterals." Gamble v. Cloud, 263 Ala. 336,82 So.2d 526 (1955). Hence, the appellee takes, if he takes at all, via the will as "lawful issue" of his father as that term was intended by the testator at the time of the execution of the will.
McCaleb v. Brown, 344 So.2d 485 (Ala. 1977) and Zimmerman v.First National Bank of Birmingham, 348 So.2d 1359 (Ala. 1977) are inapposite. Though both of those cases reflect, perhaps, the pervading policy today on adopted children as limited by statute, they should not be interpreted as delineating public policy beyond the parent-child *Page 859 
relationship expressly required in the 1931 statute.
On the interpretation of "lawful issue," Wright v. City ofTuscaloosa, 236 Ala. 374, 182 So. 72 (1938) held:
 "In its legal sense, as used in statutes, will, deeds, and other instruments, `issue' means descendants; lineal descendants; offspring." . . . (emphasis added)
A "descendant," as we held in McCaleb v. Brown, supra, is "`[o]ne on whom the law has cast the property by descent'."344 So.2d 485, at 488. Hence if we interpreted the meaning of "lawful issue" at the time of the execution of the will in 1928 then it is clear "lawful issue" would not include an adopted
child. At least, it is just as inferable (and consistent with the law at the time) that his intention was to have his "lawful issue" determined as of the time the provision took effect if, indeed, it did take effect. Therefore, I believe that by using "lawful issue" the testator's intention was to make a class gift.
"A class gift is one in which the donor intends to benefit a group or a class of persons. . . ." Bergin Haskell, Prefaceto Estates in Land and Future Interests, at 138. Henry v.Griffith, 242 Ala. 598, 7 So.2d 560 (1942).
Although none of the parties raised the issue it is clear from the will that the testator intended that there be a class gift to the "lawful issue" of his nephews, Charles and Houston Drennen "share and share alike" if neither of the nephews survived the life tenant. Neither did. As there was no living issue at the time of the execution, nor at testator's death, under common principles it is clear that the class could not open until the death of the testator in 1934. The better view, however, in light of the language of the will, would see the class both opened and closed at the death of the last of the surviving nephews in 1961 (both having died before the life tenant). This is so because until the death of his uncle in 1961 — assuming both of the testator's sisters had predeceased the nephews — the appellant had at most an undivided vested remainder in one-half of the property subject to partial divestment if his uncle had issue and predeceased the life tenant. When the uncle died without issue the class opened and appellant immediately became the only member of the class, and the class closed vesting in him, again assuming the sisters had already gone to their reward, the remainder in fee simple in the whole estate. If the class members were not to be determined, if at all, until events subsequent to the will's execution, then it is certainly difficult to believe otherwise than that the testator intended the membership of that class to be determined at the time that the class should close whether by rule of convenience or because it was biologically closed as here which, as events showed, was after the 1931 statute and indeed after the death of testator.
Using this reasoning on the dispositive issue in this case we could uphold the law, reach the desired result, and avoid many future problems the majority opinion would unleash. Perhaps the chief problem would entail requiring a testator to foresee future legislation on intestate succession affecting the testamentary field. I do not believe we should require the testator and his scrivener to engage in prestidigitation so that they might clearly express intentions contrary to legislative policy not yet articulated, or to require the testator, once such a legislative policy has been stated, regardless of how difficult it would be to even know whether or not such a policy, or even what policy, has been stated, to change provisions in his will to take himself out of the purview of that policy. This is a great burden indeed, and one this case needn't require. If we do require it, lawyers who draft wills had better exercise adroitness in creating savings clauses against such policy decisions.
SHORES and EMBRY, JJ., concur.